

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | Case No. 18-CR-251-CVE |
| | ) | |
| **Plaintiff,** | ) | **SUPERSEDING INDICTMENT** |
| | ) | **[COUNT 1: 18 U.S.C. §§ 371 and 2** |
| **v.** | ) | **– Conspiracy to Offer and Pay, and** |
| | ) | **Solicit and Receive Health Care** |
| **CHRISTOPHER R. PARKS,** | ) | **Kickbacks;** |
| **GARY ROBERT LEE,** | ) | **COUNTS 2 through 24: 42 U.S.C.** |
| **JERRY MAY KEEPERS,** | ) | **1320a-7b(b)(1)(A) – Soliciting and** |
| **KRISHNA BALARAMA** | ) | **Receiving Health Care Kickback;** |
| **PARCHURI,** | ) | **COUNT 25: 18 U.S.C. § 1349** |
| | ) | **– Conspiring to Commit Health Care** |
| **Defendants.** | ) | **Fraud;** |
| | ) | **COUNTS 26 through 32: 42 U.S.C. §** |
| | ) | **1320a-7b(b)(1)(A) – Soliciting and** |
| | ) | **Receiving Health Care Kickback;** |
| | ) | **COUNT 33: 18 U.S.C. § 1518 –** |
| | ) | **Obstruction of Criminal Investigations** |
| | ) | **of Health Care Offense;** |
| | ) | **Forfeiture Allegation: 18 U.S.C. §** |
| | ) | **982(a)(7), 18 U.S.C. § 981(a)(1)(C),** |
| | ) | **and 28 U.S.C. § 2461(c) – Health Care** |
| | ) | **Forfeiture]** |

### THE GRAND JURY CHARGES:

### COUNT ONE
**[18 U.S.C. §§ 371 and 2]**

### THE CONSPIRACY AND ITS OBJECT

1.  From in or about November 2012 to the date of this Superseding Indictment,

in the Northern District of Oklahoma and elsewhere, the defendants, **CHRISTOPHER R.**

**PARKS ("PARKS"), GARY ROBERT LEE ("LEE"), JERRY MAY KEEPERS**

**("KEEPERS"), and KRISHNA BALARAMA PARCHURI ("PARCHURI"),** did

knowingly and willfully conspire, confederate, and agree with each other and others,

known and unknown to the Grand Jury (collectively "the Conspirators"), to commit certain offenses against the United States, that is,

a.  to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to physicians to induce the physicians to refer individuals to pharmacies operated and controlled by **PARKS** and **LEE** for the furnishing of items and services for which payment may be made in whole and in part under a Federal health care program, as described below.

b.  to violate Title 42, United States Code, Section 1320-7b(b)(1) by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals to pharmacies operated and controlled by **PARKS** and **LEE** for the furnishing of items and services for which payment may be made in whole and in part under a Federal health care program, as described below.

## THE PURPOSE OF THE CONSPIRACY

2.  The purpose of the Conspiracy was to unlawfully enrich the Conspirators, including **PARKS, LEE, KEEPERS,** and **PARCHURI** at the expense of the United States Treasury and private insurers, through the corrupt practice of bribing physicians to write prescriptions for expensive compounded drugs and to submit those prescriptions to pharmacies controlled and operated by **PARKS** and **LEE**, thereby enabling the

2

Conspirators to submit large claims for payment of the costly prescriptions to various Federal health care programs and private insurers, and to divide among the Conspirators the profits from the federally-paid and insurance-paid claims.

## MANNER AND MEANS OF THE CONSPIRACY

The Conspirators used the following manner and means to achieve the object of the Conspiracy:

### Compounded Drugs Compared to Standard, FDA-Approved Drugs

3.     "Compounding" a prescription was a practice in which a licensed pharmacist or licensed physician combined, mixed or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient where standard medications, approved by the United States Food and Drug Administration ("FDA") were unsuitable due to patient allergies, intolerance to method of administration, or other uncommon factors.  Compounded medications were prescribed and mixed for specific patients with particular needs; they were not to be mixed and marketed in bulk quantities.  Compounded drugs were not FDA-approved.  That is, the FDA did not verify the safety, potency, effectiveness or manufacturing quality of compounded drugs.

4.     Compounded drugs were often far more expensive than drugs approved by the FDA for the treatment of the same physical condition and were commonly reimbursed by Federal health care programs and private insurance companies at a far higher rate than FDA-approved drugs.

## PARKS Establishes a Practice of Bribing Physicians
## for Compounded Drug Prescriptions

5.     Prior to November 2012, **PARKS** was associated with a pharmacy, Select RX, located in Tulsa, Oklahoma, that offered prescription compounding services to its customers. **PARKS** had a professional background in legal services and did not hold any medical or pharmacy license. **PARKS** solicited business for Select RX from physicians and medical professionals.

6.     In or about November 2012, **PARKS** began to market Select RX to area physicians as a place to submit compounded drug prescriptions. **PARKS** caused kickbacks to be paid to physicians for the purpose of inducing them to write compounded drug prescriptions and submit them to Select RX on behalf of their patients.

## PARKS and LEE Join Forces to Bribe Physicians for
## Compounded Drug Prescriptions

7.     **LEE** was a medical doctor licensed in the State of Oklahoma.

8.     From in or about the fall of 2012, **PARKS** and **LEE** conjointly began to acquire, own, control, and operate pharmacies through which they could market compounding services, including:

     a.     OK Compounding, LLC, of Skiatook, Oklahoma ("OK Compounding");

     b.     One Stop RX, LLC, of Tulsa, Oklahoma ("One Stop");

     c.     NBJ Pharmacy, LLC, of Houston, Texas ("NBJ"); and

     d.     Airport McKay Pharmacy of Houston, Texas ("Airport McKay").

(Collectively "the Pharmacies").

9.     Through the payment of bribes and kickbacks, the Conspirators corruptly recruited physicians to write prescriptions for compounded drugs and to submit those prescriptions to the Pharmacies for fulfillment, just as **PARKS** had done while working on behalf of Select RX.

10.     To facilitate the submission of compounded drug prescriptions to the Pharmacies, the Conspirators provided pre-printed prescription pads to physicians. The pads contained a selection of compounding formulas so that a physician could simply check a box to indicate a preferred formula. In addition, the pads bore the facsimile numbers of the Pharmacies so that the physician's staff would easily know where to submit the prescription.

11.     Instead of providing compounded pain medication prescriptions directly to their patients, who would then be free to select a pharmacy, the bribed physicians sent the prescriptions directly to the Pharmacies.

## The Conspirators Disguise the Bribes and Kickbacks

12.     In order to disguise the bribe and kickback payments to physicians, the Conspirators created sham business arrangements with physicians to promote the appearance that the Pharmacies were paying the physicians for legitimate services, rather than for prescribing and referring compounded drug prescriptions.

13.     The sham business arrangements took several forms including, but not limited to, the following:

5

a.      Contracts between the Pharmacies and physicians who purportedly provided "Medical Director" or "Consulting Physician" services to the Pharmacies in exchange for payments at designated rates. The alleged services included reviewing charts, participating in meetings with the Pharmacies, developing policies, and answering clinical questions for the Pharmacies' staff and treating physicians. Some physicians provided time logs purporting to substantiate the services they provided. In actuality, the physicians did not provide to the Pharmacies any services other than writing compounded drug prescriptions and submitting them to the Pharmacies.

b.      Limited liability companies ("LLCs") owned and operated by the Pharmacies and physicians or by Marketing Companies and physicians, who submitted compounded drug prescriptions to the Pharmacies. After the Pharmacies received payments for the prescriptions, the Conspirators transferred the profits to the LLCs for division among the physicians and the Pharmacies.

c.      Recruitment of physicians as "Medical Directors" for a bogus medical study purportedly conducted by R.U., an institution of higher education known to the Grand Jury. In actuality, the physicians performed no work in furtherance of any medical study because no legitimate study existed, as the Conspirators well knew. Nonetheless, the Conspirators paid those physicians for writing compounded drug prescriptions and submitting them to the Pharmacies.

d.      Even after bribes and kickbacks ceased to be paid to physicians, the Conspirators continued to conceal the true nature of the payments.

### Dr. Jerry Keepers

14.     **KEEPERS** was a medical doctor, licensed in the States of Oklahoma and Texas, who maintained a pain clinic practice in Friendswood, Beaumont and Humble, Texas.  In addition to his practice in Texas, **KEEPERS** established a clinic in Tulsa, Oklahoma, in or about November 2012.

15.     From in or about November 2012, **PARKS** caused bribes and kickbacks to be paid in the approximate amount of $25,000 per month to Keepers.  In exchange, **KEEPERS** wrote compounded drug prescriptions for his patients and submitted them to Select RX and NBJ.

16.     From in or about January 2013, as **PARKS** and **LEE** established additional Pharmacies, **KEEPERS** continued sending his compounded drug prescriptions to the Pharmacies in exchange for bribes and kickbacks from the Pharmacies in approximate amounts between $4,000 to $25,000 a month.

17.     In an effort to disguise the bribe and kickback payments, **KEEPERS** represented that he had been hired by OK Compounding as a National Spokesperson or Medical Director or National Marketing Director.  However, **KEEPERS** never provided any National Spokesperson or Medical Director or National Marketing Director services for OK Compounding.  The only service provided by **KEEPERS** was sending all of his compounded drug prescriptions to the Pharmacies.

18.     As part of the fraudulent concealment of his true relationship to the Pharmacies, **KEEPERS** executed a "Standing Order" form that allowed OK Compounding to change his prescriptions at the pharmacy.  If a prescription written by **KEEPERS** would

7

not be reimbursed by TRICARE, Medicare, and the FECA Program, then OK Compounding could fill the prescription with a formula that would be reimbursed without consulting **KEEPERS**.

19. The Conspirators continued to pay bribes and kickbacks to physicians, including **KEEPERS**, in exchange for their compounded drug prescriptions through in or about October 2015. During the duration of the payments, **PARKS** and **LEE** made the bribe and kickback payments through several checking accounts they controlled. Those checking accounts included OK Compounding, LLC, OK Compounding Management, LLC, and Pharmacy Consulting, LLC.

### Dr. Krishna Parchuri

20. **PARCHURI** was a doctor of osteopathic medicine licensed in the States of Arizona, Kansas, Oklahoma, Florida and Texas, who practiced orthopedic surgery in Tulsa, Oklahoma.

21. From on or about June 19, 2013, through on or about January 15, 2015, **PARKS** and **LEE** caused bribes and kickbacks to be paid in the approximate various amounts of up to $50,000 per month to **PARCHURI**. In exchange, **PARCHURI** wrote compounded drug prescriptions for his patients and submitted them to Pharmacies controlled by **PARKS** and **LEE**.

22. In addition to receiving kickback payments for prescribing compounding drugs, **PARCHURI** also received commissions from the Pharmacies for physicians that were recruited by other marketing groups with which **PARCHURI** had an affiliation, including, but not limited to, Blue Sky and the Liva Group.

8

## The Payment Process and Federal Health Care Programs

23.    Pharmacy Providers of Oklahoma ("PPOK") was a company that represented independent pharmacies in negotiations with insurance companies and that oversaw pharmacy billing processes. A majority of contracts with insurance companies and Federal health care programs were in the name of PPOK as the administrator. Prescriptions flowed from client pharmacies through PPOK for billing to insurance companies and Federal health care programs. Select RX and the Pharmacies were clients of PPOK, which handled their billing processes and submitted claims for reimbursement on their behalf to the following federal health care programs:

## TRICARE

24.    TRICARE provided health care coverage for the United States Department of Defense ("DOD") beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.

25.    Individuals who received health care benefits through TRICARE were referred to as TRICARE "beneficiaries." The Defense Health Agency ("DHA"), an agency of DOD, was the military entity responsible for overseeing and administering the TRICARE program.

26.    TRICARE provided coverage for certain prescription drugs, including certain compounded drugs, if the drugs were medically necessary and prescribed by a licensed physician.

27.    Express Scripts was the company that administered the TRICARE prescription program. If a beneficiary chose a network pharmacy, the pharmacy would

collect any applicable co-payment from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to Express Scripts, which would in turn adjudicate the claim and reimburse the pharmacy. To become a TRICARE network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste and abuse.

28. OK Compounding and One Stop, through PPOK, or their subsidiary RXLinc, submitted claims for prescription compounding drugs it dispensed to TRICARE beneficiaries.

## Medicare

29. Medicare provided benefits to individuals who were 65 years and older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services, a federal agency under the United States Department of Health and Human Services.

30. Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries." Each beneficiary was given a unique health insurance claim number. Health care providers who provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."

31. To participate in Medicare, a provider was required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for processing and payment of claims.

32.     A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services and products provided to Medicare beneficiaries.

33.     Most providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that they: (a) were responsible for all claims submitted to Medicare by themselves, their employees, and their agents; (b) would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and (c) would submit claims that were accurate, complete, and truthful.

34.     Medicare Part D provided coverage for outpatient prescription drugs. Medicare beneficiaries were able to obtain Part D coverage through: (1) enrollment in one of many prescription drug plans ("PDP"), which covered only prescription drugs and were offered by qualified private insurance plans (often referred to as drug plan "sponsors"), which received reimbursement from Medicare; or (2) a Medicare Advantage plan that covered both prescription drugs and medical services. A beneficiary was responsible for any deductible or co-payment required under his or her PDP.

35.     Medicare reimbursed providers for certain compounded drugs that were medically necessary to the treatment of a beneficiary's illness or injury, were prescribed by a beneficiary's physician or a qualified physician's assistant acting under the supervision of a physician, and were provided in accordance with Medicare regulations and guidelines that governed whether a particular service or product would be reimbursed by Medicare.

36. A pharmacy provider was required to provide certain information when filing claims with Medicare. This information included identification of the person or entity that provided the medication, identification of the medication that was provided, identification of the prescribing physician, identification of the beneficiary, and the date the prescription was dispensed.

37. OK Compounding and One Stop, through PPOK, or their subsidiary RXLinc., submitted claims for prescription compounding drugs it dispensed to Medicare beneficiaries.

### The FECA Program

38. The Federal Employees' Compensation Act, Title 5, United States Code, Sections 8101, *et seq.* ("FECA") provided certain benefits to civilian employees of the United States, for wage-loss disability due to a traumatic injury or occupational disease sustained while working as a federal employee (the "FECA program"). The Office of Workers' Compensation Programs ("OWCP"), a component of the United States Department of Labor ("DOL"), administered the FECA program.

39. When a qualified employee suffered a work-related injury, the employee filed a claim for coverage with OWCP, which then assigned the claimant an OWCP claim number.

40. To obtain reimbursement for prescription drugs provided to OWCP claimants (hereinafter referred to as "beneficiaries"), a pharmacy had to submit its prescription claims for payment to OWCP, using the beneficiary's OWCP claim number. By submitting a claim for reimbursement with OWCP, the pharmacy provider certified that

12

the service or product for which reimbursement was sought was medically necessary, appropriate, and properly billed in accordance with accepted industry standards.

41. OWCP would process the claims submitted by the provider and, if all required information was included, OWCP would reimburse the provider in accordance with an established fee schedule.

42. OK Compounding, through PPOK, or their subsidiary RXLinc., submitted claims for prescription compounding drugs it dispensed to FECA beneficiaries.

### The CHAMPVA Program

43. The Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA) was a federally funded program in which the Department of Veterans Affairs shared the cost of certain health care services and supplies with eligible beneficiaries. To be eligible CHAMPVA, the patient could not be eligible for TRICARE.

44. CHAMPVA provided coverage to the spouse or widow(er) and to the children of a Veteran who was rated permanently and totally disabled due to a service-connected disability, or was rated permanently and totally disabled due to a service-connected condition at the time of death, or died of a service-connected disability, or died on active duty and the dependents were not otherwise eligible for DOD TRICARE benefits.

45. CHAMPVA covered most health care services and supplies that were medically and psychologically necessary, including the reimbursement of medication costs. CHAMPVA was always the secondary payor to Medicare and covered Medicare's co-insurance and cost share.

46. TRICARE, Medicare, the FECA Program and the CHAMPVA Program were at all relevant times "Federal health care programs," as defined by Title 42, United States Code, Section 1320a-7b(f), that affected interstate commerce.

### The Conspirators' Claims Against The Federal Health Care Programs

47. From on or about January 8, 2013, to on or about October 3, 2014, the Conspirators caused the Pharmacies to bill TRICARE for claims in the approximate total amount of $3,425,437.85. Based on those claims, TRICARE paid the Pharmacies a total amount of approximately $3,207,514.97 for compounded pain medications dispensed by the Pharmacies to TRICARE beneficiaries.

48. From on or about January 30, 2013, to on or about May 28, 2014, the Conspirators caused the Pharmacies to bill Medicare for claims in the approximate total amount of $285,776.87. Based on those claims, Medicare paid the Pharmacies a total amount of approximately $285,776.87 for compounded pain medications dispensed by the Pharmacies to Medicare beneficiaries.

49. From on or about March 13, 2013, to on or about September 18, 2014, the Conspirators caused the Pharmacies to bill the FECA Program for claims in the approximate total amount of $1,186,855.74. Based on those claims, the FECA Program paid the Pharmacies a total amount of approximately $552,544.55 for compounded pain medications dispensed by the Pharmacies to FECA Program beneficiaries.

50. From on or about February 16, 2013, to on or about September 10, 2014, the Conspirators caused the Pharmacies to bill the CHAMPVA Program for claims in the approximate total amount of $398,173.61. Based on those claims, CHAMPVA Program

14

paid the Pharmacies a total amount of approximately $310,273.64 for compounded pain medications dispensed by the Pharmacies to CHAMPVA Program beneficiaries.

## OVERT ACTS

In furtherance of the Conspiracy, the Conspirators committed the following overt acts, among others, in the Northern District of Oklahoma and elsewhere:

51.     On or about the following dates, the Conspirators caused payments to be paid to **KEEPERS** in the approximate amounts listed below:

| OVERT ACT NO. | DATE | AMOUNT |
|---|---|---|
| 1 | November 2, 2012 | $25,000 |
| 2 | November 30, 2012 | $25,000 |
| 3 | January 8, 2013 | $25,000 |
| 4 | February 8, 2013 | $25,000 |
| 5 | March 5, 2013 | $25,000 |
| 6 | April 5, 2013 | $25,000 |
| 7 | April 29, 2013 | $6,000 |
| 8 | April 29, 2013 | $25,000 |
| 9 | May 29, 2013 | $25,000 |
| 10 | July 1, 2013 | $25,000 |
| 11 | July 1, 2013 | $4,000 |
| 12 | August 6, 2013 | $25,000 |
| 13 | September 4, 2013 | $25,000 |

| OVERT ACT NO. | DATE | AMOUNT |
|:---:|:---:|:---:|
| 14 | September 26, 2013 | $6,000 |
| 15 | October 8, 2013 | $25,000 |
| 16 | November 12, 2013 | $25,000 |
| 17 | December 11, 2013 | $25,000 |
| 18 | January 7, 2014 | $10,000 |
| 19 | January 22, 2014 | $25,000 |
| 20 | February 26, 2014 | $25,000 |
| 21 | March 17, 2014 | $25,000 |
| 22 | April 21, 2014 | $25,000 |
| 23 | May 27, 2014 | $25,000 |
| 24 | June 17, 2014 | $25,000 |
| 25 | July 21, 2014 | $25,000 |
| 26 | August 19, 2014 | $25,000 |
| 27 | September 22, 2014 | $25,000 |
| 28 | October 20, 2014 | $25,000 |
| 29 | November 24, 2014 | $25,000 |
| 30 | December 26, 2014 | $25,000 |
| 31 | January 21, 2015 | $25,000 |
| 32 | February 20, 2015 | $25,000 |
| 33 | March 24, 2015 | $25,000 |

| OVERT ACT NO. | DATE | AMOUNT |
|---|---|---|
| 34 | April 20, 2015 | $25,000 |
| 35 | May 19, 2015 | $25,000 |
| 36 | June 24, 2015 | $15,000 |
| 37 | July 23, 2015 | $15,000 |
| 38 | August 25, 2015 | $15,000 |
| 39 | September 25, 2015 | $15,000 |

52.     On or about the following dates, the Conspirators caused payments to be paid

to **PARCHURI** in the approximate amounts listed below:

| OVERT ACT NO. | DATE | AMOUNT |
|---|---|---|
| 40 | June 17, 2013 | $50,000.00 |
| 41 | July 19, 2013 | $35,000.00 |
| 42 | July 25, 2013 | $38,000.00 |
| 43 | August 20, 2013 | $25,813.30 |
| 44 | September 20, 2013 | $7,320.95 |
| 45 | October 14, 2013 | $28,399.08 |
| 46 | November 15, 2013 | $17,044.17 |
| 47 | December 12, 2013 | $17,320.55 |
| 48 | January 14, 2014 | $16,925.71 |
| 49 | February 14, 2014 | $8,709.63 |
| 50 | March 14, 2014 | $5,464.20 |

| OVERT ACT NO. | DATE | AMOUNT |
|---|---|---|
| 51 | May 16, 2014 | $1,642.97 |
| 52 | May 16, 2014 | $1,902.66 |
| 53 | June 19, 2014 | $4,401.69 |
| 54 | July 15, 2014 | $7,068.03 |
| 55 | August 14, 2014 | $6,640.36 |
| 56 | September 15, 2014 | $7,867.09 |
| 57 | October 21, 2014 | $5,246.21 |
| 58 | October 31, 2014 | $4,044.00 |
| 59 | December 15, 2014 | $1,429.00 |

All in violation of Title 18, United States Code, Sections 371 and 2.

## COUNTS TWO THROUGH TWENTY-FOUR
### [42 U.S.C. § 1320a-7b(b)(1)(A)]

53.     The Grand Jury hereby incorporates and realleges paragraphs 1 through 52 of this Superseding Indictment.

54.     From on or about the dates stated in the table below, in the Northern District of Oklahoma and elsewhere, the defendant, **JERRY MAY KEEPERS**, did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes in the form of checks payable in the approximate amounts set forth below, in return for referring, and causing the referral of, individuals for whom he had written, and caused the writing of, compounded drug prescriptions, to the Pharmacies, for the furnishing, and arranging for the furnishing, of compounded drugs, items for which payment was made in whole and in part by Federal health care programs including, but not limited to, TRICARE, Medicare the FECA Program and the CHAMPVA Program.

| COUNT | APPROXIMATE DATE | REMUNERATION |
|---|---|---|
| 2 | December 11, 2013 | Check number 4780, drawn on the OK Compounding IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 3 | January 7, 2014 | Check number 4914, drawn on the OK Compounding IBC Bank Account, in the amount of $10,000 payable to **KEEPERS**. |
| 4 | January 22, 2014 | Check number 5021, drawn on the OK Compounding IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 5 | February 26, 2014 | Check number 5320, drawn on the OK Compounding IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 6 | March 17, 2014 | Check number 5352, drawn on the OK Compounding IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 7 | April 21, 2014 | Check number 5447, drawn on the OK Compounding IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 8 | May 27, 2014 | Check number 5833, drawn on the OK Compounding IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 9 | June 17, 2014 | Check number 0023, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |

| COUNT | APPROXIMATE DATE | REMUNERATION |
|---|---|---|
| 10 | July 21, 2014 | Check number 0072, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 11 | August 19, 2014 | Check number 0083, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 12 | September 22, 2014 | Check number 0131, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS** |
| 13 | October 20, 2014 | Check number 5598, drawn on the OK Compounding IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 14 | November 24, 2014 | Check number 0216, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 15 | December 26, 2014 | Check number 0287, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 16 | January 21, 2015 | Check number 0323, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 17 | February 20, 2015 | Check number 0356, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |

| COUNT | APPROXIMATE DATE | REMUNERATION |
|---|---|---|
| 18 | March 24, 2015 | Check number 0404, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 19 | April 20, 2015 | Check number 0441, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 20 | May 19, 2015 | Check number 0482, drawn on the OK Compounding Management IBC Bank Account, in the amount of $25,000 payable to **KEEPERS**. |
| 21 | June 24, 2015 | Check number 1010, drawn on the Pharmacy Consulting LLC Central Bank of Oklahoma Account, in the amount of $15,000 payable to **KEEPERS**. |
| 22 | July 23, 2015 | Check number 1045, drawn on the Pharmacy Consulting LLC Central Bank of Oklahoma Account, in the amount of $15,000 payable to **KEEPERS**. |
| 23 | August 25, 2015 | Check number 1090, drawn on the Pharmacy Consulting LLC Central Bank of Oklahoma Account, in the amount of $15,000 payable to **KEEPERS**. |
| 24 | September 25, 2015 | Check number 1123, drawn on the Pharmacy Consulting LLC Central Bank of Oklahoma Account, in the amount of $15,000 payable to **KEEPERS**. |

All in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

## COUNT TWENTY-FIVE
### [18 U.S.C. § 1349]

55.     The Grand Jury hereby incorporates and realleges paragraphs 1 through 54 of this Superseding Indictment.

56.     From in or about January 2013 to the date of this Superseding Indictment, in the Northern District of Oklahoma and elsewhere, the defendants, **CHRISTOPHER R. PARKS, GARY ROBERT LEE, JERRY MAY KEEPERS,** and **KRISHNA BALARAMA PARCHURI,** did knowingly and willfully combine, conspire, confederate, and agree with each other and with others, known and unknown to the Grand Jury (collectively "the Health Care Fraud Conspirators"), to violate Title 18, United States Code, Section 1347, that is, to knowingly and willfully execute, and attempt to execute, a scheme and artifice (i) to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, TRICARE, Medicare, the FECA Program and CHAMPVA Program, and (ii) to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the control of, TRICARE, Medicare, the FECA Program and CHAMPVA Program, in connection with the delivery of, and payment for, health care benefits, items, and services, namely compounded drugs, ("the Scheme") as described below.

## THE PURPOSE OF THE CONSPIRACY

57.     The allegations of Paragraph 2 of this Superseding Indictment are incorporated herein by reference.

23

## MANNER AND MEANS OF THE CONSPIRACY

58.     The manner and means by which the Health Care Fraud Conspirators sought to accomplish the purposes of the conspiracy are set forth in Paragraphs 3 through 52 of this Superseding Indictment, which are incorporated herein by reference.

## The Scheme

59.     The Scheme is set forth in paragraphs 3 through 52 of this Superseding Indictment, which are incorporated herein by reference.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWENTY-SIX THROUGH THIRTY-TWO
### [42 U.S.C. § 1320a-7b(b)(1)(A)]

60.  The Grand Jury hereby incorporates and realleges paragraphs 1 through 59 of this Superseding Indictment.

61.  From on or about the dates stated in the table below, in the Northern District of Oklahoma and elsewhere, the defendant, **KRISHNA BALARAMA PARCHURI**, did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes in the form of checks payable in the approximate amounts set forth below, in return for referring, and causing the referral of, individuals for whom he had written, and caused the writing of, compounded drug prescriptions, to the Pharmacies, for the furnishing, and arranging for the furnishing, of compounded drugs, items for which payment was made in whole and in part by Federal health care programs including, but not limited to, TRICARE, Medicare, the FECA Program, and the CHAMPVA Program.

| COUNT | APPROXIMATE DATE | REMUNERATION |
|---|---|---|
| 26 | July 7, 2014 | Check number 0043 drawn on the OK Compounding Management IBC Bank account, in the amount of $4,401.69 payable to **PARCHURI**. |
| 27 | July 18, 2014 | Check number 0069 drawn on the OK Compounding Management IBC Bank account, in the amount of $7,068.03 payable to **PARCHURI**. |
| 28 | August 19, 2014 | Check number 0101 drawn on the OK Compounding Management IBC Bank account, in the amount of $6,640.36 payable to **PARCHURI**. |
| 29 | September 19, 2014 | Check number 0156 drawn on the OK Compounding Management IBC Bank account, in the amount of $7,867.09 payable to **PARCHURI**. |
| 30 | October 24, 2014 | Check number 0208 drawn on the OK Compounding Management IBC Bank account, in the amount of $5,246.21 payable to **PARCHURI**. |
| 31 | January 5, 2015 | Check number 0242 drawn on the OK Compounding Management IBC Bank account, in the amount of $4,044.00 payable to **PARCHURI**. |
| 32 | January 5, 2015 | Check number 0282 drawn on the OK Compounding Management IBC Bank account, in the amount of $1,429.00 payable to **PARCHURI**. |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

## COUNT THIRTY-THREE
**[18 U.S.C. § 1518]**

62. The Grand Jury hereby incorporates and realleges paragraphs 1 through 61 of this Superseding Indictment.

63. From in or about September 2018 and continuing through in or about April 2019, in the Northern District of Oklahoma and elsewhere, the defendant, **KRISHNA BALARAMA PARCHURI**, willfully attempted to prevent, obstruct, mislead and delay the communication of information and records relating to the investigation of health care fraud and the payment of bribes and kickbacks caused by Christopher R. Parks, Gary Robert Lee, and others known and unknown to the Grand Jury, a violation of Title 18, United States Code, Sections 371 and 1347, and Title 42, United States Code, Section 1320a-7b, to a Federal Grand Jury, a body authorized to conduct and engage in investigations for the prosecutions of health care offenses.

All in violation of Title 18, United States Code, Section 1518.

## FORFEITURE ALLEGATION
### [18 U.S.C. § 982(a)(7), 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

The allegations contained in Counts One through Thirty-Three of this Superseding Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7), Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

Upon conviction of any of the offenses alleged in Counts One through Thirty-Three of this Superseding Indictment, as part of their sentences, the defendants, **CHRISTOPHER R. PARKS, GARY ROBERT LEE, JERRY MAY KEEPERS,** and **KRISHNA BALARAMA PARCHURI**, shall forfeit to the United States any property, real or personal, constituting or derived from, directly or indirectly, the proceeds traceable to such offenses, including but not limited to:

### MONEY JUDGMENT

A money judgment in an amount of at least $2,338,008.52, because such amount represents proceeds obtained by Defendant **CHRISTOPHER R. PARKS**, as a result of such offenses.

A money judgment in an amount of at least $2,338,008.52, because such amount represents proceeds obtained by Defendant **GARY ROBERT LEE**, as a result of such offenses.

A money judgment in an amount of at least $2,375,920.52, because such amount represents proceeds obtained by Defendant **JERRY MAY KEEPERS**, as a result of such offenses.

A money judgment in an amount of at least $340,945.11, because such amount represents proceeds obtained by Defendant **KRISHNA BALARAMA PARCHURI**, as a result of such offenses.

Pursuant to Title 21, United States Code, Section 853(p), as adopted by Title 28, United States Code, Section 2461(c), the defendants, **CHRISTOPHER R. PARKS, GARY ROBERT LEE, JERRY MAY KEEPERS,** and **KRISHNA BALARAMA PARCHURI,** shall forfeit substitute property, up to the value of the property described above if, by any act or omission of the defendants, the property described above, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty. The property to be forfeited by defendants **CHRISTOPHER R. PARKS, GARY ROBERT LEE, JERRY MAY KEEPERS,** and **KRISHNA BALARAMA PARCHURI,** includes their interest, if any, in the following substitute property:

### SUBSTITUTE ASSETS

### CHRISTOPHER R. PARKS

#### Real Property

1. Real property commonly known as 722 West 108th Place South, Jenks, Tulsa County, Oklahoma, more particularly described as follows, to-wit:

   Lot 7, Block 1, Aberdeen Falls, a Subdivision in the City of Jenks, Tulsa County, State of Oklahoma, according to the Recorded Plat No. 5734.

#### Conveyances

2. One 2010 Land Rover SLX, VIN SALSK2D44AA237557;

3. One 2004 Land Rover RHS, VIN SALMF1149A165903;

4.     One 2007 Jeep LCF, VIN 1J8GR48K77C593164;

5.     One 2006 Mercedes C20, VIN WDBRF52H66F73540;

6.     One 2013 GMC Yukon XL Denali, VIN 1GKS2MEFXDR263819; and

7.     One 2014 Audi RS7, VIN WUAW2AFC6EN902564.

### Financial Accounts

8.     All U.S. currency, funds, and other monetary instruments in financial accounts, including but not limited to all checking, savings, NOW, Time, and other deposit and checking accounts; and all investment and security custodian accounts, IRA, Keogh and other retirement plan accounts.

## GARY ROBERT LEE

### Real Property

1.     Real property commonly known as 3633 E. 104 Street South, Tulsa, Tulsa County, Oklahoma, more particularly described as follows, to-wit:

Lot 8, Block 4, CHELSEA POND, an Addition to the City of Tulsa, Tulsa County, State of Oklahoma, according to the recorded plat thereof.

### Conveyances

2.     One 2013 Infiniti QX56, VIN JN8AZ2NE1D9041866;

3.     One 2006 Volvo XC9, VIN YV4CZ852861267754; and

4.     One Nissan Xterra, VIN 5N1AN08W99C509316.

### Financial Accounts

5.     All U.S. currency, funds, and other monetary instruments in financial accounts, including but not limited to all checking, savings, NOW,

Time, and other deposit and checking accounts; and all investment and security custodian accounts, IRA, Keogh and other retirement plan accounts.

**JERRY MAY KEEPERS**

## Real Property

1.  Real property commonly known as 2203 Long Valley Drive, Kingwood, Harris County, Texas, more particularly described as follows, to-wit:

    Lot 14, in Block 22 of Fosters Mill Village, Section 3, a subdivision in Harris County, Texas, according to the map or plat thereof recorded in Volume 304, Page 102, of the Map records of Harris County, Texas.

2.  Real property commonly known as 0 Kings River Court, Humble, Harris County, Texas, more particularly described as follows, to-wit:

    1.9850 acres of land being Lots 20 and 21, in Block 1, of AMENDING PLAT OF KINGS RIVER ESTATES, SECTION 1, an addition in Harris County, Texas, according to the map or plat thereof recorded under File Code No. 376050, of the Map Records of Harris County, Texas, Save & Except that portion of Lot 21 conveyed from Gene Pahnke to Jen-yi Huang and Yuh-Chin Chang filed under County Clerk's File No. T035188, of the Official Records of Harris County, Texas, said 1.9850 acres being more particularly described by metes and bounds as follows:

    BEGINNING at 5/8 inch iron rod found in the Northeast right-of-way line of Kings River Court (80 feet wide) for the Westmost corner of said Lot 20;
    THENCE North 49° 00' 30" East, along the common line of Lots 19 and 20, a distance of 414.71 feet to a 1/2 inch iron rod set for corner;
    THENCE South 38° 30' 16" East, at a distance of 166.11 feet past the common corner of said Lots 20 and 21, in all a distance of 205.98 feet to an angle;
    THENCE South 81° 10' 31" East, along the Northeast line of said Lot 21, a distance of 48.29 feet to a 1/2 inch iron rod set for corner;
    THENCE South 57° 37' 31" West, along the Northwest line of above said Huang-Chang Tract, a distance of 458.43 feet (called 458.36 feet) to a 1/2 inch iron rod set on the Northeast right-of-way line of said Kings River Court;

THENCE in a Northwesterly direction along said right-of-way line, being a curve to the left having a radius of 935.00 feet, an arc length of 175.00 feet to the POINT OF BEGINNING.

### Conveyances

3.     One 2017 Acura ILX, VIN 19UDE2F78HA015131;

4.     One 2017 Lexus ES 350, VIN 58ABK1GGXHU077043;

5.     One 2010 Lexus LS 460, VIN JTHBL5EF4A5093618;

6.     One 2013 Hyundai Santa Fe Sport, VIN 5XYZU3LB9DG109390; and

7.     One 2010 25' Aluminum Boat, Vessel 7400BF, Hull Number HAMP9039F010.

### Financial Accounts

8.     All U.S. currency, funds, and other monetary instruments in financial accounts, including but not limited to all checking, savings, NOW, Time, and other deposit and checking accounts; and all investment and security custodian accounts, IRA, Keogh and other retirement plan accounts.

## KRISHNA BALARAMA PARCHURI

### Real Property

1.     Real property commonly known as 10617 South Winston Court, Tulsa, Tulsa County, Oklahoma, more particularly described as follows, to-wit:

Lot 4, Block 1, STONEGATE ESTATES Subdivision, Section 28, Township 18, Range 13

### Conveyances

2.     One 2015 Audi S8 Quattro, VIN WAUK2AFDXFN012734; and

3.     One 2014 Infiniti QX80 Base, VIN JN8AZ2NE8E9062165.

**Financial Accounts**

4.   All U.S. currency, funds, and other monetary instruments in financial accounts, including but not limited to all checking, savings, NOW, Time, and other deposit and checking accounts; and all investment and security custodian accounts, IRA, Keogh and other retirement plan accounts.

All pursuant to Title 18, United States Code, Section 982(a)(7), Title 18, United

States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

R. TRENT SHORES                                    A TRUE BILL
UNITED STATES ATTORNEY


_____            _/s/ Grand Jury Foreperson_____
MELODY N. NELSON                               Grand Jury Foreperson
Assistant United States Attorney